# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
May 15, 2001 Session

## STATE OF TENNESSEE v. JERRY RAY DAVIDSON

**Direct Appeal from the Criminal Court for Dickson County**
**No. CR2232     Allen Wallace, Judge**

---

**No. M1998-00105-CCA-R3-CD - Filed January 7, 2002**

---

## OPINION

The appellant, Jerry Ray Davidson, was found guilty by a jury of premeditated first degree murder and aggravated kidnapping. Thereafter, the jury sentenced the appellant to death based upon the finding of three aggravating circumstances: the appellant had previously been convicted of one or more violent felonies; the murders were knowingly committed while the appellant was engaged in committing a felony, i.e., aggravated kidnapping; and the appellant knowingly mutilated the body of the victim after death. The appellant received a consecutive twenty year sentence for the kidnapping conviction. On appeal, the appellant raises the following issues:

(1)     Whether the trial erred when it denied the appellant's motions to change venue, strike the venire and grant additional peremptory challenges;

(2)     Whether the evidence is sufficient to sustain the convictions;

(3)     Whether a witness for the prosecution should have been allowed to offer opinion testimony;

(4)     Whether the trial court correctly instructed the jury about the unanimity of its verdict;

(5)     Whether the jury's verdict is proper;

(6)     Whether the prosecutor has unlimited discretion in seeking the death penalty;

(7)     Whether the death penalty is imposed in a discriminatory manner; and

(8)     Whether Tennessee courts employ an adequate proportionality review.

Having thoroughly considered all of these issues and having fully reviewed the appellate record in this case, we affirm the convictions and the sentence of death imposed for first degree murder.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and JOHN EVERETT WILLIAMS, JJ., joined.

Brock Mehler, Nashville, Tennessee (appeal only); Michael J. Love (trial and appeal); Collier W. Goodlett, Clarksville, Tennessee (trial only), for appellant, Jerry Ray Davidson.

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; Alice B. Lustre, Assistant Attorney General; Dan Alsobrooks, District Attorney General, for appellee, State of Tennessee.

## OPINION

## FACTS

### Guilt Phase

The victim, Virginia Jackson, arrived via taxi at Bronco's Bar in Dickson, Tennessee around 8:00 or 8:30 p.m. on September 26, 1995. The bartender, Carol Owens, refused to allow the victim to bring her dog inside. The victim was carrying her purse and a pillow, and she was wearing multi-colored clips in her hair. The appellant, who had been in the establishment since 4:00 or 5:00 p.m., was sitting at the bar when the victim arrived. Mary Ann Wheat, Owens and the victim were conversing, but the appellant, who happened to be sitting next to the victim, was not involved in the conversation. According to Owens, the entire time the appellant was in Bronco's he sat quietly at the bar and drank beer. According to Wheat, the victim did not appear intoxicated, and she only saw the victim drink two beers over the three hour period they were together. Owens also testified that the victim only ordered two beers. Owens further testified that the appellant had consumed about twelve beers while he was there. When Wheat left at approximately 11:00 p.m., Owens, the victim and the appellant were the only persons remaining. Owens called the victim a cab, but the company was closed for the night. The appellant then offered to give the victim a ride. Until that time, Owens had not seen the appellant and the victim converse. The two individuals left in appellant's red pick-up truck.

Just prior to the murder in this case, the appellant was employed by St. Thomas Hospital in Nashville as a janitor in the department where surgical instruments were cleaned. The appellant had worked at the hospital for five years. However, September 25, 1995 was the last day he had shown up for work. Tyrone Upshaw, the appellant's supervisor, testified that the appellant was a good worker; he was independent and always showed up for work. The appellant did not contact anyone

-2-

at work concerning his absence, and he was eventually fired. Rebecca Deloach car-pooled to work from Dickson with the appellant. Deloach testified that the last time she rode in appellant's truck, the passenger seat appeared to be normal and intact.

The appellant lived with his mother, Aline Davidson. The appellant failed to come home for several days after the 25th. The appellant's mother became worried and filed a missing persons report with the police. On October 8, 1995, the appellant telephoned his mother and told her he was going to stop by the house. He also told his mother that some creditors might be calling on him, so he was going to lay low for a while. He said that he was alright and that he was in Knoxville. When the appellant stopped by the house about a week later, Ms. Davidson gave her son some money. The appellant also retrieved some clothes and the camper top for his red pick-up truck.

The appellant again visited Bronco's Bar on October 9, 1995. Because the victim's son had previously inquired of Owens about his mother's disappearance, Owens asked the appellant where he took the victim that night. After asking why Owens wanted to know, the appellant replied that he dropped the victim off at a Kroger grocery store. Later that same day, Detective Tim Eads of the Dickson County Sheriff's Department came into the bar to question Owens about the victim's disappearance. The appellant was still present in the bar at the time, and Owens indicated to Eads that the appellant had given the victim a ride on September 26. The appellant also told Eads that he had dropped the victim off at a Kroger around midnight. After Eads left, the appellant watched his car pull out of the parking lot, and then about ten minutes later the appellant also left the bar. After that day Owens never again saw the appellant in the bar.

The victim's family became worried after noticing that her car remained parked for several days behind a gas station near her house. On September 30, 1995, Charles Daniel, the victim's brother-in-law, observed some clothing on an access road on the Jackson family farm. Several days later, Daniels decided to move the clothing out of the road. The clothing consisted of a pair of socks, a pair of women's panties, a sweater, as well as some hair clips and a bed pillow. The authorities later found the victim's cellular telephone in some nearby brush. Jennifer Koch, the victim's daughter, identified these items as her mother's. Koch last saw her mother at a family wedding on September 23, 1995. After noticing her mother's car parked behind the gas station for several days, Koch became worried and filed a missing person's report on October 1, 1995. The door to the victim's house was unlocked, which, according to Koch, was very unusual. Also, according to one of the appellant's witnesses, the back tires on the victim's truck had been slashed several days before she was reported missing.

Melinda Jones, who lives in the country on Old Yellow Creek Road in Dickson near the Houston County line, observed a small red truck she did not recognize drive down the road past her house sometime between October 4 and 6, 1995. She had also observed this same truck drive by about a week prior to this time. Jones testified that there was not much traffic on her road and that she recognized most vehicles traveling it. Jones did not recognize the driver, and she noticed something wrapped tightly, in "something white, maybe a sheet," in the cab of the truck fall onto the driver's shoulder, which the driver had to "push off." Jones later saw the appellant's picture on

television and realized then that the appellant was the person driving the red truck. The victim's partially buried body was discovered on October 18, 1995 by two hunters in the woods about a mile and half down from Jones' house on Old Yellow Creek Road.

Teresa Smith, an employee of a convenience store near Old Yellow Creek Road, testified that the appellant came into the store in the morning sometime between October 2 and 6, 1995. Smith had never seen the appellant before. According to Smith, the appellant's pants were dirty, "like he'd been digging in like a garden or something." The appellant sat in the store for about an hour and drank a cup of coffee. The appellant was driving a red pick-up truck with a camper top. About a week later, the appellant came back to the store, bought a drink, and sat inside for about an hour.

On October 12, 1995, Darla Harvey was working at Lakeview Tavern in Cumberland City. The appellant came in the bar at approximately 2:30 p.m. He sat at the bar and ordered a beer. Harvey testified that the appellant's pants and shoes were covered in red dirt. Harvey further testified that the appellant just sat at the bar without saying a word and "blatantly stare[d] at me for a long period of time," about an hour and fifteen minutes. Harvey felt uncomfortable because she did not know the appellant, so she walked outside to look at his vehicle. The appellant was driving a small red pick-up truck with a camper top that had been spray painted red. Harvey looked through the window of the camper and saw a sleeping bag soiled by red clay, a dirty shovel, a chain and two Rubbermaid containers. According to Harvey, the cab of the truck was "really, really messy," "like he had been living in there." After Harvey returned inside, the appellant eventually went outside to grab something from his truck and then came back inside the bar with one hand in his pant's pocket. Harvey testified that she became scared because the appellant continued to sit at the bar without saying a word. Around 5:30 p.m., more patrons started arriving, and Harvey told some of them that she was afraid of the appellant. Some of the men told the appellant to leave, or they would escort him out of the bar. The appellant left. During the three hours the appellant was in the bar he had ordered only one beer.

On October 19, 1995, Betty Lutts was working at Robert's Creek Bar near Cuba Landing. The appellant came into the bar about 1:00 or 2:00 p.m and ordered a beer. The appellant quietly sat at the bar. Lutts testified that she felt uneasy because the appellant just stared at her. At approximately 6:00 p.m., Sheriff Ronnie Toungette of Humphreys County entered the bar and arrested the appellant. The appellant was in possession of a .25 automatic pistol, a chrome "knuckle knife" and a pair of handcuffs. A full length shotgun and a sawed-off shotgun, along with some shells, a knife, various tools, a shovel, a tent, a sleeping bag, a camping stove, coolers, some clothing, food and Marlboro cigarettes, among other items, were also recovered from the appellant's truck. The truck did not have a camper top at that time. The passenger seat had a chain with a padlock wrapped around it. Bloodstains were found on the passenger seat. DNA testing revealed that the victim could not be excluded as a possible contributor of the blood.

Five spent shotgun shells found at a campsite in the woods that were found approximately 2,500 feet across the road from where the victim's body was found were determined to have been fired from one of the shotguns recovered from appellant's truck. Also, a knife, a pair of handcuffs

similar to ones found on the appellant when he was arrested (the same key fit both pairs), a can of red spray paint matching the brand of a can found in appellant's truck, a prescription pill bottle belonging to the victim, the victim's wallet containing some of her identification cards, the victim's leather cigarette case, two ATM receipts reflecting a withdrawal from appellant's bank account on October 4, 1995, an empty box that had once contained the same brand of tent recovered from the appellant's truck, men's underpants and t-shirt matching the size and brand of underwear recovered from the appellant's truck, a pair of pants matching the brand of a pair found in appellant's truck, a flashlight matching the brand and color of one found in appellant's truck, and empty packs of Marlboro cigarettes, as well as numerous other items, were found around the campsite. There was also some general trash and debris in the same area, which was described by witnesses as a dumping site.

On October 20, 1995, Dr. Murray Marks, a forensic anthropologist, examined the victim's body on site and concluded that the body had been there for about a month. The victim was found laying face down. The victim's left forearm had been gnawed by animals, and the left hand was missing. The victim's head was also missing. There was evidence of animal activity on the upper left portion of the back and the neck region. Dr. Marks determined that the shallow grave in which the body was found was prepared with a space for the head to rest. Dr. Marks opined that the victim was buried with her head intact, and sometime thereafter her head was removed. Dr. Marks observed both what he believed were incision marks and evidence of animal activity. According to Dr. Marks, it is possible that the victim's neck was cut, she was buried with her head intact, and then the head was removed by animals sometime thereafter. He also stated it was possible that the head could have been removed by a person sometime thereafter. The skull, however, was never found. The anterior portion of the victim's torso was cut cleanly from the neck to the navel. In and around the grave, Dr. Marks found a cigarette butt and a chunk of dirt consistent in shape and size with having been lodged in the handle of a shovel near the blade. Dr. Marks testified that the victim may not have been killed at the grave site because they did not find any significant amount of blood in the dirt around the body. Dr. Marks viewed the body before the autopsy was performed and thereafter reviewed the medical examiner's findings.

Detective Eads and Ted Tarpley interviewed the appellant after his arrest on October 19 and 20, 1995, from 9:40 p.m until 5:00 a.m. Eads asked appellant if they could search his truck but the appellant declined to give consent, stating that there might be something in the truck he did not want the police to find. According to Eads, appellant was referring to the sawed-off shotgun. Appellant denied any knowledge of the victim's whereabouts and insisted that he dropped her off at a Kroger grocery store. Appellant stated that after he left the victim at Kroger he went to a bar in Nashville until about 4:00 a.m., and the next morning he left for Knoxville and Chattanooga. Eads asked appellant, hypothetically, where he thought the victim might be, and the appellant responded, hypothetically, that someone may have chained her to a tree. The appellant also stated that the victim's head and hands might be missing to keep anyone from identifying the body. In response to being asked why he quit his job, the appellant stated that things were getting too tense, and he just needed to take a leave.

-5-

Dr. Charles Warren Harlan, Assistant Medical Examiner, performed the autopsy of the victim. The victim's liver tested positive for alcohol and Prozac, and the kidney tested positive for Prozac. However, given the state of decomposition, Dr. Harlan could not determine how much alcohol or Prozac was present. Dr. Harlan testified that the state of decomposition in this case was consistent with death occurring within twenty-four hours after the last time the victim was seen alive. Dr. Harlan could not make a definitive conclusion as to the cause of death, but opined that it was the result of a homicide. Dr. Harlan opined that the incision to the victim's torso occurred postmortem and would most likely have been made with a reasonably sharp knife. He also opined that the victim's head was removed after death by a person with a sharp instrument and that it was not removed by an animal. He stated that the victim may have died as the result of wounds to the neck or head.

Dr. Frank Joseph Peretti, Associate Medical Examiner and Forensic Pathologist at the Arkansas State Crime Laboratory, testified on behalf of the appellant. Dr. Peretti testified that there is no way of knowing, given the condition of the victim's body, whether she was killed within twenty-four hours of last being seen alive. According to Dr. Peretti, it was not possible to determine whether the knife wounds to the victim were inflicted before or after death. Dr. Peretti further stated that it was not possible to determine what caused death in this case. Because Dr. Harlan did not allow Dr. Peretti to remove the soft tissue from the neck bones, he was not able to positively determine how the head was separated from the body. He did state that the incision to the victim's chest was very smooth and that the bones exhibited some tool marks. On cross-examination, Dr. Peretti agreed that he and Dr. Harlan entertained different opinions in this case concerning the removal of the head.

The defense introduced evidence that the victim was being prescribed Prozac in April and September 1995, that she suffered severe drug overdoses in 1990, 1985, 1983, 1982, 1980 and 1978. The defense also presented testimony from a DNA expert who could not exclude the victim as the donor of the blood found inside his truck.

**Penalty Phase**

The appellant has previous convictions for assault and battery with intent to commit rape (1971), felonious crime against nature (1983), felonious sexual battery (1983), and assault and battery with intent to ravish and have unlawful carnal knowledge of a female over twelve years of age (1976). The state also presented testimony regarding the mutilation of the body.

Appellant offered the testimony of his mother who testified about his childhood and stated that before his arrest in this case he helped her more than anyone else. Appellant's father was not a member of the household. Appellant did not complete his education and spent about two years in a mental institution. Appellant's younger brother was killed in Vietnam. Appellant's co-workers all testified about his good work ethic and quiet and kind temperament. Also, Rev. Joseph Ingle testified that the appellant has a genuine concern for others and can make a productive contribution in the prison environment.

**ISSUES**

**I. Venue and Jury Composition**

The appellant claims the trial court erred by denying his motion to change venue, by refusing to strike the venire, and by denying appellant's request for additional peremptory challenges. Prior to trial, the appellant filed a motion to change venue. The trial court conducted a hearing on appellant's motion and in a subsequent written order denied the appellant's request.

The victim in this case was a member of a family prominent in Dickson County for politics, law and medicine. During the hearing on the motion to change venue, the appellant presented numerous newspaper articles about the case, as well as a videotape of a television news broadcast that discussed, in part, this case. The newspaper articles appeared in October and November of 1995 and February, March and June of 1996. The news story was broadcast on television in January 1997. Several of the reports contained information regarding appellant's criminal record and even stated that the appellant was a repeat sex offender capable of committing murder. The trial of this case occurred in late August 1997. The appellant contends the trial court was determined to try this case in Dickson County and, based upon the extensive pretrial publicity and the prominence of the victim's family, that it was impossible for the court to impanel an impartial jury that would accord the appellant a fair trial.

A change of venue may be granted if it appears that "due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had." Tenn. R. Crim. P. 21(a). A motion for change of venue is left to the sound discretion of the trial court and the court's ruling will be reversed on appeal only upon a clear showing of an abuse of that discretion. State v. Howell, 868 S.W.2d 238, 249 (Tenn. 1993); State v. Hoover, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979). The mere fact that jurors have been exposed to pretrial publicity will not warrant a change of venue. State v. Mann, 959 S.W.2d 503, 531-32 (Tenn. 1997). Similarly, prejudice will not be presumed on the mere showing of extensive pretrial publicity. State v. Stapleton, 638 S.W.2d 850, 856 (Tenn. Crim. App. 1982). In fact, jurors may possess knowledge of the facts of the case and may still be qualified to serve on the panel. State v. Bates, 804 S.W.2d 868, 877 (Tenn. 1991). Before a conviction will be overturned on a venue issue, the appellant must demonstrate on appeal that the jurors were biased or prejudiced against him. State v. Melson, 638 S.W.2d 342, 360-61 (Tenn. 1982). The test is whether the jurors who actually sat on the panel and rendered the verdict and sentence were prejudiced. State v. Kyger, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989). Furthermore, the scope and extent of voir dire is also left to the sound discretion of the trial court. State v. Smith, 993 S.W.2d 6, 28 (Tenn. 1999). Jurors who have been exposed to pretrial publicity may sit on the panel if they can demonstrate to the trial court that they can put aside what they have heard and decide the case on the evidence presented at trial. State v. Gray, 960 S.W.2d 598, 608 (Tenn. Crim. App. 1997).

Both parties acknowledge that the voir dire in this case was extensive. The prospective jurors filled out questionnaires beforehand and were subject to individual questioning regarding their knowledge of the facts of this case, their ability to set aside any preconceived notions about guilt, and their attitude regarding the death penalty. Furthermore, both parties recognize that a very large number of the prospective jurors knew something about the facts of this case or were familiar with the victim's family. Several of the prospective jurors also knew about the appellant's criminal history. In fact, almost half of the venire were excused because they could not set aside their opinions regarding the appellant's responsibility. However, those jurors who actually sat on the panel during trial stated that they could set aside what they heard and decide the case solely on the evidence presented during trial. Again, jurors may sit on a case even if they have formed an opinion assuming the trial court is satisfied that the juror is able to set aside the opinion and render a verdict based upon the evidence presented in court. State v. Brown, 836 S.W.2d 530, 549 (Tenn. 1992).

In State v. Hoover, 594 S.W.2d 743 (Tenn. Crim. App. 1979), this Court set forth the factors that should be considered to determine whether a change of venue is warranted. The Court listed seventeen factors: the nature, extent, and timing of pretrial publicity; the nature of the publicity as fair or inflammatory; the particular content of the publicity; the degree to which the publicity complained of has permeated the area from which the venire is drawn; the degree to which the publicity circulated outside the area from which the venire is drawn; the time elapsed from the release of the publicity until the trial; the degree of care exercised in the selection of the jury; the ease or difficulty in selecting the jury; the venire person's familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire; the defendant's utilization of his peremptory challenges; the defendant's utilization of challenges for cause; the participation by police or by prosecution in the release of the publicity; the severity of the offense charged; the absence or presence of threats, demonstrations or other hostility against the defendant; the size of the area from which the venire is drawn; affidavits, hearsay or opinion testimony of witnesses; and the nature of the verdict returned by the trial jury. Again, however, for there to be a reversal of a conviction based upon a claim that the trial court improperly denied a motion for a change of venue, the "defendant must demonstrate that the jurors who actually sat on the case were biased or prejudiced against him." State v. Evans, 838 S.W.2d 185, 192 (Tenn. 1992). We turn then to the impartiality of the trial jurors.

Both parties in this case used all of their peremptory challenges, and despite the appellant's request, the trial court refused to allow any additional peremptory challenges. The appellant argues on appeal that this decision prejudiced his right to a fair and impartial jury because two of the jurors who sat on the case had some connection to the victim and/or her family, and one of these two jurors knew about the appellant's prior criminal record.

Both Joy Anderson and Myra Sensing admitted during voir dire that they had some connection with the victim and/or her family. Ms. Anderson's younger brother was a friend of the victim's son. Ms. Sensing's mother's boss from twenty years prior was the victim's aunt. Despite these facts, both jurors affirmatively stated that their associations would not affect their ability to be

impartial in this matter. Having reviewed the transcript of the voir dire, we find no reason to believe otherwise.

When asked by appellant's counsel about her exposure to pretrial publicity surrounding this case, Juror Sensing remembered reading that the appellant "had been sent to a psychiatrist and that he wasn't mentally stable before." She also stated: "I think I remember reading that he had been a sex offender before." Ms. Sensing further stated, however, that she does not always believe what she reads in the papers. Although the appellant used all of his peremptory challenges, counsel did not challenge Ms. Sensing for cause on this basis nor did the trial judge remove her from the panel. On appeal, however, the appellant alleges error because Ms. Sensing was allowed to sit on the jury despite her knowledge of the appellant's prior record.

We agree with the state's position that the appellant has waived this particular issue. "[A] defendant must not only exhaust his peremptory challenges, but he must also challenge or offer to challenge an additional prospective juror in order to complain on appeal that the trial judge's error in refusing to excuse for cause rendered his jury not impartial." State v. Doelman, 620 S.W.2d 96, 100 (Tenn. Crim. App. 1981). Furthermore, the United States Supreme Court has held that "juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone [does not] presumptively deprive[] the defendant of due process." Murphy v. Florida, 421 U.S. 794, 799, 95 S. Ct 2031, 2036, 44 L. Ed. 2d 589 (1975). The Supreme Court decided that the "totality of the circumstances" of the trial must be examined to determine whether or not the defendant was denied a fair trial and due process of law because of a juror's knowledge of the defendant's prior criminal record.

The juror at issue here simply stated that she "thinks she remembered" reading something about appellant's prior record. However, once this statement was made, neither counsel for the appellant nor the trial judge further inquired about the extent or validity of her knowledge. Juror Sensing ultimately stated that she could set aside what she had read and base her decision upon the evidence presented in the courtroom.

Tennessee Rule of Criminal Procedure 24(b), which governs challenges for cause, provides:

> If the trial judge, after examination of any juror, is of the opinion that grounds for challenge for cause are present, the judge shall excuse that juror from the trial of the case. After the trial judge has tentatively determined that the jury meets the prescribed qualifications, adversary counsel may conduct further examination and challenges for cause may be exercised alternatively by counsel for the respective parties.

We note that Rule 24(b) states the trial judge "shall" excuse a juror if, upon questioning by the court, the judge is not satisfied that the juror meets the qualifications. However, either party "may" challenge the juror for cause if, upon further questioning by counsel, counsel believes a challenge for cause exists. In this case, the trial judge conducted an initial examination of the prospective

jurors to determine whether they had already formed an opinion about appellant's guilt and whether they would be able to impose the death penalty under the appropriate circumstances. After questioning Juror Sensing, the trial judge was satisfied by her answers to these inquiries and tentatively determined that she was qualified to sit on the panel. Thereafter, counsel for the appellant conducted an individual examination, and during this questioning Juror Sensing revealed that she thought she remembered reading about appellant's prior record. Again, however, counsel for the appellant failed to proffer a challenge for cause. See Doelman, 620 S.W.2d at 100. This was his prerogative, but he may not now raise as error the failure to excuse this juror for cause. See Tenn. R. App. P. 36(a).

Moreover, as noted above, a juror's knowledge about a state defendant's prior convictions does not presumptively deprive the defendant of a fair trial. Juror Sensing stated that she could set aside what she read and decide the case based on the evidence presented at trial. Nothing about her statements during voir dire suggest that she harbored any bias or prejudice toward the appellant.

Having reviewed the entire voir dire process, we are confident that the trial court did not abuse its discretion in selecting the jury in this case. The appellant has failed to demonstrate how the jurors who sat on his case were biased or prejudiced against him.

We are mindful of this Court's decisions in State v. Shepherd, 862 S.W.2d 557 (Tenn. Crim. App. 1992), State v. Caffey, 729 S.W.2d 266 (Tenn. Crim. App. 1986), and State v. Kilburn, 782 S.W.2d 199 (Tenn. Crim. App. 1989). However, we do not believe similar circumstances exist in the present case to warrant a reversal on this issue. In Shepherd, at least ten members of the jury knew about the defendant's criminal history, including knowledge of the defendant's alleged involvement in another murder. Furthermore, a couple of the jurors admitted to having initially formed an opinion about the defendant's guilt. More importantly, counsel for the defendant challenged these jurors for cause. However, the trial court allowed them to remain on the panel. In the case at hand, the appellant did not challenge Juror Sensing for cause on this information. Furthermore, Juror Sensing did not admit to having formed an opinion about appellant's guilt and, in contrast to the jurors in Shepherd, Juror Sensing's knowledge about the appellant's criminal record was never actually verified.

In Caffey, relied upon by this Court in Shepherd, in the middle of trial the trial court discovered that one of the members of the jury had learned the defendant was serving a prison sentence outside the State of Tennessee. The trial court questioned the juror and, upon deciding that the juror had been exposed to prejudicial information, the trial court excused this juror. Counsel for the defendant was not afforded an opportunity to rehabilitate the juror. On appeal, this Court found that the trial judge acted appropriately. Caffey can readily be distinguished from the case at hand. A juror who obtains prejudicial information in the middle of trial is obviously not subject to challenge for cause during pretrial voir dire. And finally, in Kilburn, also relied on by this Court in Shepherd, a juror admitted during voir dire to having knowledge of the defendant's prior record. Again, counsel for the defense challenged the juror for cause, however, after further questioning by the trial court and counsel for the state, the trial court allowed this juror to remain on the panel. On

appeal, this Court found that the aggressive rehabilitation by the trial court and prosecution created a substantial risk that the juror's judgment would affected during trial. In the case at hand, neither counsel nor the trial judge questioned Juror Sensing any further about her knowledge, and again, she ultimately stated that she would not be affected by what she read.

In State v. Claybrook, 736 S.W.2d 95, 100 (Tenn. 1987), which this Court cited in Shepherd, our supreme court stated:

> In every criminal case the defendant is entitled to have his guilt or innocence determined by impartial and unbiased jurors who have not been subjected to the influence of inadmissible and prejudicial information such as knowledge that the defendant has been convicted or accused of other crimes, especially of crimes substantially similar to that for which he is standing trial.

However, the issue before the Court in Claybrook was whether or not the trial judge erred in refusing to allow individual voir dire outside the presence of the other prospective jurors. The defendant in Claybrook was denied the opportunity to fully examine those jurors who possessed knowledge of the defendant's record. The concern of the Court in Claybrook is not present in the case at hand. The appellant was afforded every opportunity to individually question the prospective jurors in this case. Again, although the appellant was aware of what Juror Sensing stated, the appellant chose not to pursue any further inquiry into the matter and chose not to challenge this juror for cause based on this information. Accordingly, we find no reversible error on this point.

Appellant's counsel also challenged Juror Sensing for cause based upon her position on the death penalty. According to the appellant's argument, Ms. Sensing should have been removed from the panel because of her belief in "eye for an eye" justice and the deterrent effect of the death penalty. She believed that the death penalty serves a valid purpose and that it is not imposed enough. Her religious beliefs taught her to obey the laws of the land. However, she also stated that the death penalty is not appropriate in every case and that she could follow the dictates of the law in deciding whether the penalty should be imposed. When counsel moved to remove Ms. Sensing for cause based upon her position on the death penalty, the trial judge, although stating that he had considered removing her until the questions and answers about the imposition of the penalty were more fully developed, denied this challenge for cause. Having reviewed the entire examination of this juror, we do not believe the trial judge abused his discretion in this respect.

The appellant also claims that the trial court erred in refusing to grant him additional peremptory challenges. The appellant was granted the number of challenges prescribed by Rule 24(d). The appellant proffers no authority in support of his argument that the trial judge was compelled to grant, or should have granted, the appellant additional challenges. Nor can we find any such authority. Accordingly, we find this issue to be without merit.

As this Court has previously recognized, a defendant who commits a serious crime cannot be expected to remain anonymous in the community. See State v. Griffis, 964 S.W.2d 577, 597

(Tenn. Crim. App. 1997). Based on our review of the record, we conclude that the trial court did not abuse its discretion by denying the defendant's motion for a change of venue. The appellant has failed to establish that the jurors selected to serve during his trial were biased or prejudiced against him in light of the fact that all jurors empaneled expressed that they could listen to the evidence and base their decisions on the evidence presented at trial. Furthermore, we hold that the trial court did not abuse its discretion by refusing to strike the venire or refusing to grant the appellant additional peremptory challenges.

## II. Sufficiency of the Evidence

The appellant contends that the state failed to prove the necessary elements of first degree murder. Specifically, the appellant argues that there is no evidence regarding his state of mind at the time of the killing, no evidence of planning, no evidence of a prior relationship with the victim, and no evidence regarding the cause of death. The appellant also contends that there was no proof of false imprisonment to support the conviction for aggravated kidnapping. The state disagrees and argues that the circumstantial evidence leaves no doubt but that the appellant committed the crimes for which he was convicted.

Where the sufficiency of the evidence is contested on appeal, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); see also Tenn. R. App. P. 13(e). This principle is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence or a combination of direct and circumstantial evidence. See State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996).

In determining the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this Court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. See Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). To the contrary, this Court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences that may be drawn from the evidence. See State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the jury as the trier of fact. See Tuttle, 914 S.W.2d at 932. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Grace, 493 S.W.2d at 476.

First degree murder is defined, in part, as "the premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). "Premeditation" is described as "an act done after

-12-

the exercise of reflection and judgment." Id. § 39-13-202(d). To find a defendant guilty of premeditated murder, the jury must determine that "the intent to kill was formed prior to the act itself" and that "the accused was sufficiently free from excitement and passion as to be capable of premeditation." Id. "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Id. § 39-11-302(a).

Because premeditation entails proof of a state of mind about which there may be no direct evidence, "cases have long recognized that the necessary elements of first-degree murder may be shown by circumstantial evidence." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Premeditation is a question of fact to be determined by the jury. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). And, the jury may infer premeditation from the manner and circumstances of the killing. See, e.g., State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our courts have enumerated several factors that may support the existence of premeditation, including: a prior relationship that might suggest motive; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; infliction of multiple wounds; preparation before the killing for concealment of the crime; destruction or secretion of evidence of the murder; and the appellant's demeanor before and after the killing, including calmness immediately after the killing. See State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); Pike, 978 S.W.2d at 914-15; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). See also State v. Gentry, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993); State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992).

The appellant does not contest the fact that he killed the victim. However, he asks this Court to reduce his conviction to second degree murder and remand the case for resentencing. Given all of the evidence presented, we hold that the jury reasonably found that the appellant premeditated the killing of the victim and intentionally carried out the homicide. The victim was last seen alive with the appellant. The appellant's ATM receipts and numerous other items similar to those later found in his possession were located near where the victim was buried. Moreover, the appellant was observed by witnesses in the vicinity of the wooded area where the body was found.

There is no evidence in this case of a prior relationship between the appellant and the victim. The appellant did not declare his intent to kill the victim. Further, there is no direct evidence that the appellant took specific precautions for concealment of the crime prior to the killing. However, the above-listed factors which the appellate courts have found to be helpful to the jury are not exclusive or exhaustive. Indeed, the jury may consider all the circumstances surrounding the killing. See, e.g., State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). In fact, several of the specific factors previously enumerated by the supreme court encompass a defendant's activities and/or demeanor after the killing has occurred. Accordingly, a jury is not necessarily limited by any specific evidence when determining whether a defendant intentionally killed the victim after the exercise of reflection and judgment.

The evidence in this case clearly establishes that the appellant took great steps to cover-up the murder. The single fact that he buried the body in a remote area of the woods evinces such an attempt. We note, however, that concealment of evidence after the crime is, alone, insufficient to establish premeditation. See State v. West, 844 S.W.2d 144, 148 (Tenn. 1992). The fact that the appellant concealed the body of the victim in an isolated area is not prima facie evidence of a premeditated homicide. "Although concealment of evidence may itself be evidence of guilt . . . the concealment of evidence may be associated with the commission of any crime and the accompanying fear of punishment." State v. Michael Carlton Bailey, No. 01C01-9403-CC-00105 1995 WL 424996, (Tenn. Crim. App. at Nashville, Jul. 20, 1995), perm. to appeal denied, (Tenn. Jan. 8, 1996) (citing Cagle v. State, 507 S.W.2d 121, 129 (Tenn. Crim. App. 1973)). "The fact that evidence is subsequently hidden from the police reveals nothing about a criminal's state of mind before the crime." Id. (citation omitted).

We believe, however, that given all of the evidence presented about the circumstances surrounding the killing in this case, including the fact that the body was buried, the jury could reasonably infer intent and premeditation. The victim in this case was unarmed. And while there is no evidence of the appellant's demeanor immediately after the killing, the testimony established that the appellant sat quietly near the victim at the bar for approximately three hours before offering her a ride home. This was the last time anyone saw the victim alive, and one of the state's experts testified that the state of the body's decomposition was consistent with the victim having died within twenty-four hours of last being seen alive. Again, "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). The appellant's actions at the bar on the night the victim was last seen alive were consistent with his actions in other bars on separate occasions. The state argued to the jury that these actions presented a specific pattern on the part of the appellant to pick up women and assisted in establishing the intent and planning required for commission of the crimes in this case. We believe the jury could reasonably have made this inference.

Moreover, the appellant's actions after the killing in this case are inconsistent with a state of mind that would have produced a rash or impulsive killing. The state's expert testified that the head was removed after death by a human being. The victim was also cut cleanly in front from the neck to the abdomen with some sort of reasonably sharp instrument. According to the state's expert witness, this wound was also inflicted postmortem. See id. The evidence demonstrates that the appellant took great care in inflicting this wound. While removing the head and burying the body demonstrates the appellant's attempt to conceal his crimes, cutting the victim's torso in such a precise manner did not assist in this concealment. Rather the jury could infer that the torso wound was inflicted by the appellant for some sort of gratification and that in turn the murder was premeditated and carried out for this purpose.

The appellant identified his victim and watched her for several hours in the bar before offering to give her a ride home. The jury could reasonably have inferred that the appellant, thereafter, handcuffed and chained the victim to the passenger seat in his truck. The jury also could

-14-

reasonably have inferred that the appellant possessed these items of restraint because he knew he was going to carry out the ensuing crimes. The victim was likely killed within twenty-four hours after leaving the bar. The appellant buried the victim's body in a remote location. The appellant removed the victim's head and mutilated the body. Given all of this evidence, we believe a rational jury could have inferred that the appellant acted with a premeditated intent to kill.

Similarly, and contrary to the appellant's argument, we believe the evidence is sufficient to support the jury's finding of aggravated kidnapping. A person commits aggravated kidnapping when that person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty," Tenn. Code Ann. § 39-13-302(a), and the victim suffers bodily injury. Tenn. Code Ann. § 39-13-304. Given the testimony presented at trial, the jury could reasonably have inferred that the appellant handcuffed and chained the victim to the passenger seat in his truck in order to prevent her from escaping before eventually killing her.

Whether the elements of the charged offenses exist is a question for the jury, and the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). We believe the appellant has failed to meet his burden in this case, and we find that all of the evidence supports the convictions for aggravated kidnapping and an intentional and premeditated killing. Accordingly, this issue is without merit.

### III. Testimony of Darla Harvey

Next, the appellant argues that the trial court erred in allowing Darla Harvey's testimony into evidence. The appellant contends her testimony was prohibited by Tennessee Rule of Evidence 401, 403 and 701, as well as his constitutional right to a fair trial. More specifically, the appellant argues that Harvey's testimony was irrelevant and presented nothing more than impermissible opinions of a lay witness. Even if admissible, appellant argues that its probative value was outweighed by its prejudicial effect.

Prior to this witness' testimony, the court conducted a hearing outside the presence of the jury, and, over defense objection, allowed the testimony as evidence of motive or a common scheme or design. See Tenn. R. Evid. 404(b). The appellant claims generally that Harvey's testimony was cumulative to the testimony of other witnesses who described the appellant's behavior in the various other bars. However, the appellant also argues that Harvey's statements about how the appellant made her feel and her statements that she suspected something was awry were irrelevant and inadmissible opinions offered by this lay witness.

According to Harvey, the appellant ordered one beer over the approximately three hour period of time he remained inside the bar. The appellant did not speak and simply stared at Harvey. There was some amount of time when the appellant was the only patron inside the bar. At one point, the appellant went outside to his truck to retrieve more cigarettes. Several of the other witnesses told similar stories about the appellant's actions while in the other bars. The state theorized that the

-15-

appellant's actions in these instances, which were similar to those the night he offered to give the victim a ride home, helped establish the appellant's intent and planning. We believe this evidence was properly admitted as relevant under the state's theory of the case. See Tenn. R. Evid. 404(b). Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid.401. Furthermore, we do not find that this was "needless presentation of cumulative evidence." Tenn. R. Evid. 403. Harvey was one of only several witnesses who testified about the appellant's actions at five separate establishments, and she was the only witness to testify about the appellant's actions at her bar.

Tennessee Rule of Evidence 701(a), governs the admissibility of opinion testimony by lay witnesses:

> (a) Generally. If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are
> (1) rationally based on the perception of the witness and
> (2) helpful to a clear understanding of the witness's testimony of the determination of a fact in issue.

Tenn. R. Evid. 701(a). How a witness describes the way he or she reacted to an incident is a matter of fact of which only that witness would have knowledge. See Tenn. R. Evid. 602. We do agree, however, that those portions of Harvey's testimony in which she stated that she thought something was wrong because the appellant just sat there and stared at her is irrelevant. The appellant argues these opinions were not rationally based on Harvey's perceptions and that they were not helpful or necessary to a clear understanding of Harvey's testimony. We agree. At one point during Harvey's testimony, Harvey told the jury she thought the appellant was a "nut." Defense counsel objected, and the trial court sustained. Considering Harvey's testimony as a whole, we do not believe her opinion of the appellant or of her feelings was helpful to a clear understanding of her testimony. Several other witnesses testified about similar conduct without offering any opinions. By introducing these witnesses, the state was attempting to prove planning or a pattern on appellant's part. Harvey's testimony, minus her opinion, was sufficient to corroborate the testimony of the other witnesses. Her opinion, that she thought something was wrong, should have been excluded.

Harvey's testimony about the appellant's actions while in her bar was appropriate and relevant. Her statements about her feelings are irrelevant. See Rule 401. However, considering this inadmissible testimony in light of the entire record on appeal, including the fact that several other witnesses conveyed similar stories about the appellant's behavior, we find that any error in the admission of this evidence was harmless. Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

-16-

## IV. Instruction on Unanimity of Verdict

Next, the appellant argues that the trial court's instruction to the jury that it must unanimously agree in order to impose a life sentence while declining to give an instruction on the effect of a non-unanimous verdict is misleading and coercive and injects arbitrariness into sentencing. As the state correctly observes, the appellant has waived this issue by failing to object to the instruction during trial. See Tenn. R. App. P. 36(a). Moreover, the supreme court has repeatedly held that a jury instruction that the jury must unanimously agree in order to impose a life sentence without an instruction regarding the effect of a non-unanimous verdict does not offend constitutional standards. See State v. Keen, 31 S.W.3d 196, 233 (Tenn. 2000); State v. Cribbs, 967 S.W.2d 773, 796 (Tenn. 1998); State v. Brimmer, 876 S.W.2d 75, 87 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253, 268 (Tenn. 1994).

## V. The Jury's Verdict

The appellant advances two arguments concerning the legality of the jury's verdict in this case. Initially, however, we note, that the appellant has waived this issue on appeal. The appellant neither made a contemporaneous objection to the jury's verdict nor included this issue in his motion for a new trial. See Tenn. R. App. P. 3(e); State v. Walker, 910 S.W.2d 381, 386 (Tenn. 1995).

Nevertheless, having reviewed each argument, we find both to be without merit. First, the appellant claims the jury's verdict is incomplete because the jury did not write on the verdict form the entire language of the aggravating circumstances it found. The state sought the following aggravating circumstances in this case:

> (2) The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person;

> (7) The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any . . . [aggravated] kidnaping . . . ;

> (13) The defendant knowingly mutilated the body of the victim after death.

Tenn. Code Ann. § 39-13-204(i)(2), (7), (13). On the verdict form provided by the trial court in this case, the jury wrote the following:

> (1) Previously convicted of one (1) or more felonies, etc.
> (2) The murder was knowingly committed, etc.
> (3) The defendant knowingly mutilated the body of the victim after death.

-17-

The appellant relies upon State v. Harris, 989 S.W.2d 307 (Tenn. 1999), in support of his argument on appeal. The jury in Harris found that the murder was "especially heinous and atrocious," which is not the complete language of the (i)(5) aggravating circumstance. See Tenn. Code Ann. § 39-13-204(i)(5) ("The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death."). Upon questioning by the trial court, the jury indicated that they intended to omit the remaining statutory language of this aggravating circumstance. Because of this intentional omission, the supreme court found the jury's verdict to be erroneous. The court, however, found the error to be statutory, rather than constitutional, because the defendant was sentenced to life without parole instead of death. The court concluded that the error was harmless. The court noted, though, that constitutional vagueness concerns would have been implicated had the jury sentenced defendant to death. The court also stated: "We also again reiterate that 'where the jury reports an incorrect or imperfect verdict, the trial court has both the power and duty to redirect the jury's attention to the law and return them to the jury room with directions to reconsider their verdict. State v. Nichols, 877 S.W.2d 722, 730 (Tenn. 1994)."

Our Supreme Court has also held, however, that the death penalty statute does not require the jury to reduce to writing, verbatim, the language of the aggravating circumstances so found. See State v. Teel, 793 S.W.2d 236, 250 (Tenn. 1990); see also State v. Bland, 958 S.W.2d 651, 661 n.6 (Tenn. 1997). In Teel, the jury did not reduce to writing the complete wording of the aggravating circumstances so found. The court held: "The finding of the jury is sufficient to comply with the statute in that the aggravating circumstances found are clearly those allowed by the statue and permit effective appellate review of the sentence." Id. However, as this Court recently observed, "a less-than-verbatim statement of an aggravating circumstance must be so clear and certain that its meaning is not capable of mistake." State v. Michael D. Rimmer, No. W1999-00637-CCA-R3-DD, 2001 WL 567960 (Tenn. Crim. App. at Jackson, May 25, 2001), perm. to app. denied, (Tenn., Oct. 8, 2001) (citing State v. Henley, 774 S.W.2d 908, 917 (Tenn. 1989) and Baldwin v. State, 372 S.W.2d 188, 189 (Tenn. 1963)).

The jury in this case was properly instructed regarding the aggravating circumstances. The trial court provided the jury with the complete language of the circumstances as defined by the statute. Upon questioning by the trial court, the jury affirmed what they wrote on the verdict form. We do not believe the jury in this case intentionally omitted any wording from the statutory language. The jury, after writing on the verdict form the words with which the statutory language begins, completed listing two of the three aggravators with the notation "etc." Et cetera (or etc.), as defined in Black's Law Dictionary, 6th ed., means "and the rest; and so on; and so forth." "So, after reciting the initiatory words of a set formula, or a clause already given in full, etc. is added, as an abbreviation, for the sake of convenience." Id. Having reviewed the jury's verdict in conjunction with the trial court's instruction, we find that the verdict is clear and certain as to its meaning and is not capable of mistake. Again, the jury is not required to set forth the exact or complete wording of the aggravating circumstances. See Teel, 793 S.W.2d at 250. Accordingly, this argument is without merit.

Next, the appellant claims the verdict is incomplete because the jury did not specifically state on the verdict form provided by the trial court that the aggravating circumstances were proven beyond a reasonable doubt. The Tennessee Death Penalty Statute provides as follows:

(g)(1) If the jury unanimously determines that:

(A) At least one (1) statutory aggravating circumstance or several statutory aggravating circumstances have been proven by the state beyond a reasonable doubt; and

(B) Such circumstance or circumstances have been proven by the state to outweigh any mitigating circumstances beyond a reasonable doubt;

then the sentence shall be death.

(2)(A) If the death penalty is the sentence of the jury, the jury shall:

(i) Reduce to writing the statutory aggravating circumstance or statutory aggravating circumstances so found; and

(ii) Signify that the state has proven beyond a reasonable doubt that the statutory aggravating circumstance or circumstances outweigh any mitigating circumstances.

(B) These findings and verdict shall be returned to the judge upon a form provided by the court which may appear substantially as follows:

PUNISHMENT OF DEATH

We, the jury, unanimously find the following listed statutory aggravating circumstance or circumstances:

[Here list the statutory aggravating circumstance or circumstances so found.]

We, the jury, unanimously find that the state has proven beyond a reasonable doubt that the statutory aggravating circumstance or circumstances outweigh any mitigating circumstances.

Therefore, we, the jury, unanimously find that the punishment shall be death.

Tenn. Code Ann. § 39-13-204(g).

The jury in this case was instructed as follows:

Tennessee law provides that no sentence of death . . . shall be imposed by a jury but upon a unanimous finding that the state has proven beyond a reasonable doubt the existence of one (1) or more of the statutory aggravating circumstances

. . .

Members of the Jury, the court has read to you the aggravating circumstances which the law requires you to consider if you find beyond a reasonable doubt that the evidence was established.

. . .

If you unanimously determine that at least one statutory aggravating circumstance or several statutory aggravating circumstances have been proven by the state, beyond a reasonable doubt, and said circumstance or circumstances have been proven by the state to outweigh any mitigating circumstance or circumstances, beyond a reasonable doubt[,] the sentence shall be death.  The jury shall reduce to writing the statutory aggravating circumstance or statutory aggravating circumstances so found, and signify that the state has proven beyond a reasonable doubt that the statutory aggravating circumstance or circumstances outweigh any mitigating circumstances.

The verdict form signed by the jury in this case states: "We, the jury, unanimously find the following listed aggravating circumstances [sic] or circumstances."  The verdict form continues by stating that "[w]e, the jury, unanimously find that the state has proven beyond a reasonable doubt that the statutory aggravating circumstance or circumstances so listed above outweigh any mitigating circumstances."  The language of the jury's verdict in this case mirrors the language contained in the form provided by the statute.  Upon the jury's return from its deliberation, the following occurred in open court:

The Court:  Members of the jury, your Foreperson has handed me a form that says, "We, the jury, unanimously find the following statutory aggravating circumstance or circumstances; one, has previously been convicted of one or more felonies; two, the murder was knowingly committed; and, three, the defendant knowingly mutilated the body of the victim after death.  We, the jury, unanimously find the state has proven beyond a reasonable doubt the statutory aggravating circumstance or circumstances so listed above outweigh the mitigating circumstances, therefore, we, the jury unanimously find the punishment for the defendant Jerry Davidson shall be death."  It's signed by the Foreman and all the members of the jury.  So say ye all, ladies and gentlemen of the jury?

Jury:  (ANSWERED AFFIRMATIVE) Yes.

-20-

This very issue was recently addressed by this Court in State v. Timothy McKinney, No. W1999-00844-CCA-R3-DD, 2001 WL 298636 (Tenn. Crim. App. at Jackson, Mar. 28, 2001) (appeal pending before Supreme Court). Similar to the appellant in McKinney, the appellant in the case at hand relies upon State v. Carter, 988 S.W.2d 145 (Tenn. 1999) and State v. Stephenson, 878 S.W.2d 530 (Tenn. 1994) in support of his argument on appeal. Both Carter and Stephenson are cases in that the trial court relied upon an outdated statute which contained an improper burden of proof. Such is not the case here. Accordingly, appellant's reliance on these two cases is misplaced.

The appellant in McKinney argued that the jury's verdict was erroneous because the jury failed to state in its verdict that the aggravating circumstance so found was proven beyond a reasonable doubt. Finding this argument to be without merit, this Court held:

> A jury is presumed to follow instructions from a trial court. See State v. Cribbs, 967 S.W.2d 773, 784 (Tenn. 1998). The trial court in this case instructed the jury, no fewer than three times, that it must find the existence of the statutory aggravating circumstance beyond a reasonable doubt. . . It is clear that the jury found the existence of the . . . aggravating circumstance beyond a reasonable doubt, and the verdict in this case is adequate.

We agree with this rationale. The jury in this case was clearly instructed that it must find that the state proved the existence of the aggravating circumstances beyond a reasonable doubt. Having reviewed the entire record in this case, including the proof presented at the sentencing hearing, it is clear to us that the jury found the existence of these three aggravating circumstances beyond a reasonable doubt. We find that the jury's written verdict is sufficient to pass legal muster.

## VI. Discretion of Prosecutor in Seeking Death Penalty

The appellant argues that there are no guidelines or procedures to assist prosecutors in Tennessee in determining when to seek the death penalty. According to the appellant, because the prosecutors have unlimited discretion in this respect, the death penalty imposed in this case is arbitrary and capricious. This argument has repeatedly been rejected by our supreme court. See, e.g., State v. Hines, 919 S.W.2d 573, 582 (Tenn. 1995).

## VII. Discrimination in Imposition of the Death Penalty

The appellant also argues that the death penalty is imposed in Tennessee in a discriminatory manner based upon race, geography and gender. This argument has also been repeatedly rejected by our supreme court. See, e.g., State v. Brimmer, 876 S.W.2d 75, 87 (Tenn. 1994).

## VIII. Proportionality Review

Finally, the appellant complains that there are no meaningful standards articulated in this Court's proportionality review of the death sentence. The appellant argues that the supreme court's

decision in State v. Bland, 958 S.W.2d 651 (Tenn. 1997), "effectively precludes a finding that any death sentence is comparatively disproportionate."

Pursuant to Tenn. Code Ann. § 39-13-206(c)(1), this Court must also consider whether the sentence of death was imposed in an arbitrary fashion, whether the evidence supports the jury's finding of the aggravating circumstances, whether the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances, and whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. In Bland, 958 S.W.2d 651, the Supreme Court outlined the process appellate courts should employ when conducting a comparative proportionality review. The review required is not a rigid, objective test, id. at 668, nor are the courts bound to consider only those cases in which exactly the same aggravating circumstances have been found, State v. Brimmer, 876 S.W.2d 75, 84 (Tenn. 1994). It is the duty of the appellate court not to "assure that a sentence less than death was never imposed in a case with similar characteristics," but to "assure that no aberrant death sentence is affirmed." Bland, 958 S.W.2d at 665.

With respect to the circumstances of the offense, we consider: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. With respect to comparing the character of the defendants, the following factors are relevant: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); and (8) the defendant's capacity for rehabilitation.

The current Tennessee capital sentencing scheme utilizes a comparative proportionality review similar to that upheld by the United States Supreme Court in Gregg v. Georgia, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976). See Bland, 958 S.W.2d at 662-64. The appellant's argument that the lack of meaningful review standards pursuant to Tenn. Code Ann. § 39-13-206 and Bland deprive him of due process has been rejected by our supreme court. See, e.g., State v. Keen, 31 S.W.3d 196 (Tenn. 2000).

The facts and circumstances in this case have been detailed above. The fifty-two year old white male appellant kidnapped and killed the unsuspecting forty-three year old white female victim. The victim's body was mutilated after death, and it was discovered buried in the woods. The appellant has a history of violent behavior. There is no evidence of remorse by the appellant and the appellant did not offer any assistance to the authorities in this case. The jury found three aggravating circumstances: that the appellant has previous convictions for violent felonies; that the murder was committed while the appellant was kidnaping the victim; and that the appellant mutilated the body of the victim after death.

While no two cases are identical, considering the factors outlined above, we have compared the circumstances of the present case with other first degree murder cases and conclude that the penalty imposed in this case is not disproportionate to that imposed in similar cases. State v. Carruthers, 35 S.W.2d 516 (Tenn. 2000) (the defendant was sentenced to death based upon the finding of four aggravating circumstances, including that the defendant was previously convicted of one or more violent felonies and that the murder was committed while the defendant was engaged in kidnapping); State v. Keough, 18 S.W.3d 175 (Tenn. 2000) (the defendant was sentenced to death based upon the finding on one aggravating circumstance, that the defendant was previously convicted of one or more violent felonies); State v. Bates, 804 S.W.2d 868 (Tenn. 1991) (the defendant was sentenced to death based on three aggravating circumstances, including that the defendant was previously convicted of one or more violent felonies and that the murder was committed while the defendant was engaged in kidnapping the victim); State v. Alley, 776 S.W.2d 506 (Tenn. 1989) {the defendant was sentenced to death based upon the finding of two aggravating circumstances, including that the murder was committed while the defendant was engaged in kidnapping); See, e.g., State v. House, 743 S.W.2d 141 (Tenn. 1987) (death penalty imposed upon finding of three aggravating circumstances, including that the defendant was previously convicted of one or more violent felonies and that the murder was committed while defendant was engaged in kidnapping).

We are convinced that the result in this case was neither disproportionate nor aberrant or arbitrary. Moreover, having thoroughly reviewed the record in this case, we believe the evidence supports the jury's finding of the aggravating circumstances and its finding that the aggravating factors outweigh the mitigating evidence that was introduced on appellant's behalf.

## CONCLUSION

Based upon the foregoing, the judgment of the trial court is affirmed, as is the sentence of death imposed by the jury.

_____
JERRY L. SMITH, JUDGE